UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PAULETTE M.,

                    Plaintiff,

            v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                 Defendant.

**MEMORANDUM & ORDER**
23-CV-04668 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Paulette M.[1] seeks review, pursuant to 42 U.S.C. § 405(g), of a final decision of

the Commissioner of Social Security Administration ("SSA") that denied her application for

disability insurance benefits ("DIB").  *See* ECF No. 1 (Compl.).  Plaintiff and Defendant have

filed cross-motions for judgment on the pleadings pursuant to Rule 12(c).  *See* ECF Nos. 9, 11.

Because the Administrative Law Judge ("ALJ") made no legal error and her decision was

supported by substantial evidence, Defendant's motion is GRANTED, Plaintiff's motion is

DENIED, and the ALJ's decision is AFFIRMED.

## BACKGROUND

On March 26, 2020, Plaintiff filed her application for DIB on the basis of the following

mental health impairments:  major depressive disorder, anxiety disorder, borderline personality

disorder, and chronic post-traumatic stress disorder ("PTSD").  ECF No. 1 ¶ 5; ECF No. 7 at 93

---

[1]    Plaintiff's name has been partially redacted in compliance with Federal Rule of Civil
Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and
Case Management of the Judicial Conference of the United States.  The Clerk of Court has
modified the docket to reflect Plaintiff's abbreviated name.

(Administrative Record; "AR").[2]  The application alleges a disability onset date of March 20, 2018, the same day Plaintiff reportedly stopped working as a pharmacy beauty consultant at CVS.  *See* ECF No. 1 ¶ 5; AR at 47, 294.  At the time of her DIB application, Plaintiff was a 23-year-old high school graduate with additional work experience in the copy and print department of Staples (as well as, much earlier, as a sales associate).  *See* AR at 73, 294, 327, 354.

### I.    Plaintiff's Treatment History

Plaintiff started psychiatric treatment at Paramus High Focus Center ("HFC") on April 10, 2018.  *See id.* at 481.  During her pre-admission screening, she reported increased psychiatric symptoms, including anxiety, PTSD, and depression.  *See id.*  She described "very extreme" behavioral patterns, such as going without eating or binge eating.  *See id.*  She also told the screener that she "just want[ed] to be in bed and sleep all day long" and had "no motivation to do anything."  *See id.*  Plaintiff also reported a history of alcohol abuse, and further explained that it had worsened in the prior six months.  *See id.* at 482–83.  At the time of her admission to HFC, Plaintiff was diagnosed with severe bipolar disorder, generalized anxiety disorder, PTSD, and severe alcohol use disorder.  *See id.* at 503.

On July 10, 2018, Plaintiff was admitted to Bellevue Hospital Center after attempting suicide by hanging while she was intoxicated.  *See id.* at 436, 439, 449.  Her admission paperwork indicated diagnoses of bipolar and dissociative identity disorders but noted that she had not been taking her medications since February 2018 and had instead increased substance use.  *See id.* at 437, 452–53.  During her time in the hospital, Plaintiff also reported that she had been regularly using alcohol since age thirteen, but "with excessive binge drinking in the past

---

[2]      Citations to ECF refer to the pages assigned by the Electronic Case Files System.  All AR page citations refer to the bold Bates stamp at the bottom right corner of each page in ECF Nos. 7 and 7-1.  Unless otherwise indicated, when quoting cases and the AR, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

few months." *Id.* at 451. She also reported that she began to use cocaine in the prior month. *See id.* at 449, 451. In describing the day of her suicide attempt, Plaintiff stated that she was out with friends and drinking heavily when she "impulsively decid[ed] to book a hotel room because '[she] needed a place to do it.'" *Id.* at 453. Prior to this incident, Plaintiff had been considering inpatient substance abuse treatment and restarting medication because she felt that she was "spiraling." *See id.* at 452–53. She also stated that she was "happy to be alive" and "happy they got [her] to the hospital in time." *Id.* at 453. Plaintiff appeared motivated to return to treatment. *See id.*

At the time of her discharge from Bellevue on July 20, 2018, *see id.* at 330, Plaintiff denied any suicidal ideation, thoughts of self-harm, or depressive symptoms, *see id.* at 454. Plaintiff then returned to Paramus HFC for further treatment. *See id.* at 505. There, she was admitted to an inpatient program that consisted of daily group therapy sessions as well as individual therapy, family sessions, and medication management. *See id.* at 585 (Sept. 10, 2018, Discharge Notes). She was diagnosed with severe major depressive disorder, PTSD, and severe alcohol use disorder. *See id.* at 527–28. The treatment notes indicate that Plaintiff stated that "excessive alcohol use . . . led to [her] impulsive suicide attempt on 7/10" and that she had been drinking "a lot" before it. *Id.* at 505, 527. The notes also state that Plaintiff was using cocaine one to two times per week in the two months before her hospitalization. *See id.* at 529. Later, Plaintiff was transitioned to intensive outpatient treatment, and at the time of her discharge in September 2018, she showed improved mood and behavior and denied suicidal plans and symptoms of psychosis. *See id.* at 585–86.

Next, Plaintiff began outpatient psychiatric care at Portrait Health Centers in October 2018. *See id.* at 1051–55. She attended regular counseling sessions through June 2019, during

which her mental status examinations, as a general matter, exhibited unremarkable findings

except for some notations of fair to poor insight and judgment. *See id.* at 963–1055. During her

counseling sessions, Plaintiff discussed her long-term goals and expressed a desire to improve

her coping skills. *See, e.g.*, *id.* at 972, 1025. She mentioned engaging in escorting work as a

way to save money but reported being triggered by and struggling to cope with that kind of work.

*See id.* at 1025, 1027. By mid-December 2018, Plaintiff reported not taking her medications due

to their negative side effects. *See id.* at 1025.

On January 25, 2019, Plaintiff mentioned having had a drink while out with a friend,

which she described as the point at which she "normally . . . start[s] spiraling." *Id.* at 1009.

Shortly thereafter, on January 31, she reported marijuana use to assist with her appetite and

sleeping. *See id.* at 1005. From there, the treatment notes from Plaintiff's counseling sessions

generally indicated increased symptoms of depression and additional instances of alcohol

consumption. *See id.* at 995, 999. In February 2019, she stated that she knew she had a

"problem" with drinking and that she "gave up things to get better and things haven't gotten

better," proceeding to question, "what was the point in giving it up[?]" *Id.* at 995.

By March 19, 2019, Plaintiff was expressing feeling better and there was some discussion

with her counselor of reducing the number of counseling sessions. *See id.* at 987. However, on

March 29, 2019, Plaintiff reported "one instance of increased drinking," *id.* at 985, and on April

11, 2019, the treatment notes describe a "crisis situation," *id.* at 983. Specifically, she missed

medication for two days, binged on alcohol (drinking seven drinks in one hour), and

"impulsively overdos[ed] with at least 7 lithium pills" (which she subsequently vomited) at

home. *See id.* She also failed to attend her prior therapy appointment. *See id.* In May 2019,

Plaintiff reported an episode of binge drinking that led to her engaging in self-harm by cutting

herself, an incident she acknowledged she "should have never let . . . happen." *Id.* at 970. By June 2019, she indicated that she had stopped working as an escort because "[t]he money wasn't even worth it anymore." *Id.* at 968. Plaintiff had one last session with her counselor on June 25, 2019, during which they reviewed her "achieved goals, including emotion regulation, decrease in symptoms of depression and anxiety, increase in socialization, decrease in harmful behaviors[,] . . . and [i]ncrease in self-image." *Id.* at 964. Plaintiff also reported a decrease in smoking and alcohol consumption. *See id.* at 965.

## II.    Medical Opinions

### A.   *Treating Licensed Mental Health Counselor Joanne Mackie*

Nothing in the record indicates that Plaintiff sought psychiatric treatment between approximately June 2019 and January 2020. However, on February 5, 2020, Plaintiff began seeing Licensed Mental Health Counselor ("LMHC") Joanne Mackie. *See id.* at 415, 622. In a November 2, 2020, letter to SSA, LMHC Mackie diagnosed Plaintiff with borderline personality disorder, major depressive disorder, chronic PTSD, and dissociative identity disorder, developing a treatment plan that provided Plaintiff with trauma therapy to assist her "in a feeling of safety." *See id.* at 622–23.[3] In that letter, LMHC Mackie further explained that Plaintiff's progress was slow-going due to her "diagnoses and flashbacks to traumatic experiences." *Id.* at 623. She further opined that Plaintiff, among other things, had difficulty interacting and communicating with others; struggled to remember medications, appointments, or plans; easily dissociated in

---

[3]    Plaintiff's date last insured ("DLI") was March 31, 2020. *See* AR at 11, 93. With that DLI, the remainder of Plaintiff's psychiatric treatment—including the vast majority of the records and opinions of her treating sources—occurred outside of the eligibility period to demonstrate her disability prior to the DLI, *see Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762 (S.D.N.Y. 2017) (citing *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989)), *aff'd*, 746 F. App'x 83 (2d Cir. 2019). The ALJ noted this, *see* AR at 23, and her treatment of this post-DLI evidence is discussed in greater detail below, *see infra* at 26.

times of stress; experienced agoraphobia to the point that she could not leave her apartment; and showed "extreme reactivity to the actions of others." *Id.* In summary, LMHC Mackie wrote that "[Plaintiff] would be negatively impacted by work for the foreseeable future due to inability to interact with other people without detrimental effects on her mental health." *Id.*

LMHC Mackie also completed a medical source statement on May 18, 2021, in which she opined that Plaintiff had poor or no ability to follow work rules, deal with the public, interact with supervisors, deal with work stresses, and maintain attention. *See id.* at 755. She further opined that Plaintiff had "extreme difficulty in managing stressors," rendering her "unable to maintain objectivity and interact in ways expected by employers." *Id.* Neither opinion mentioned substance abuse. *See id.* at 622–23, 755–76.

### B. Treating Nurse Practitioner Hannah Cochran

In April 2020 (after the DLI), Plaintiff began seeing Psychiatric Nurse Practitioner ("NP") Hannah Cochran, who provided medication management and semi-regular examinations to assess Plaintiff's major depressive disorder, generalized anxiety disorder, PTSD, and borderline personality and dissociative identity disorder. *See id.* at 613, 635. During her mental status examinations through May 2022, Plaintiff presented with appropriate appearance and cognition, and the treatment notes are otherwise unremarkable. *See id.* at 689–708, 759–73, 1058, 1061–85, 1097–98. Plaintiff reported bouts of anxious and/or depressed mood, but also generally reported to be sleeping better and taking her medications. *See, e.g.*, *id.* at 689.

On February 3, 2021, NP Cochran completed a medical source statement in which she opined that Plaintiff "[w]ill have difficulties completing tasks and taking care of herself" and that her anxiety "makes it difficult for her to hold jobs and to function in society." *Id.* at 635. The medical opinion noted Plaintiff's ongoing symptoms of depression and highlighted her previous

suicide attempts, including as a child; hospitalization; and trauma stemming from childhood sexual and physical abuse, sexual assaults, and domestic violence. *See id.*

In a May 21, 2021, medical source statement, NP Cochran opined that Plaintiff had poor ability to deal with the public or work stresses, that she had baseline suicidal ideation, and that she had anxiety, which could make it difficult for Plaintiff to concentrate. *See id.* at 757–58. On February 24, 2022, NP Cochran reported that Plaintiff had an overall worsened state, opining that she had poor ability to relate to and interact with others, use judgment, maintain attention or concentration, and function independently. *See id.* at 1056–57. NP Cochran also stated that Plaintiff had good ability to understand and carry out simple job instructions, but she was limited by her "[s]evere and destructive outbursts," "[e]xtreme mood swings," and poor judgment due to "emotional dysregulation." *Id.* In May 2022, NP Cochran submitted two additional medical source statements in response to Dr. Efobi's opinion, discussed further below. On May 16, she wrote that Plaintiff "is not using any drugs or tobacco and only drinks occasionally and socially, so substances do not, in any way, impair her ability to work." *Id.* at 1058. And on May 20, she opined that Plaintiff "is totally disabled without consideration of any past or present drug and/or alcohol use" because she "is currently not using drugs and/or alcohol and remains disabled." *Id.* at 1059. NP Cochran submitted the latter opinion on a template form; she provided no further explication. *See id.*

### C. Medical Expert Chukwuemeka Efobi, M.D.

A specialist in addiction psychiatry, Dr. Chukwuemeka Efobi, reviewed Plaintiff's records and responded to the ALJ's request for medical interrogatories on October 12 and 13, 2021. *See id.* at 10, 954–62. He opined that, when accounting for Plaintiff's substance use, her mental impairments caused marked limitations in understanding, remembering, or applying

information; interacting with others; and concentrating, persisting, or maintaining pace.  *See id.* at 959.  On the other hand, Dr. Efobi explained how, if Plaintiff abstained from substance use, Plaintiff would have no more than mild to moderate limitations.  *See id.* at 954, 959.  Dr. Efobi explained that "[a]lcohol [and] [c]ocaine use were strong factors in [the] severity of [Plaintiff]'s limitations" and concluded that "with sustained sobriety [and] continued [mental health] treatment[,] [P]laintiff could do simple work with occasional interactions with supervisors [and] coworkers."  *See id.* at 955, 962.

### III.   Hearing Testimony

On July 6, 2021, and May 17, 2022, the ALJ held telephonic hearings at which Plaintiff was represented by counsel.  *See id.* at 10.  Plaintiff testified that she was unable to work due to mental illness, stating that she "spend[s] [her] days in bed all day long feeling depressed . . . [and] anxious" and that her "sense of hopelessness and anxiety," which she has "constant thoughts of," interfere with [her] day-to-day."  *Id.* at 50.  At the time of the hearing, Plaintiff was taking various medications, which she said were helping "somewhat."  *See id.* at 48–49.  In response to questions from her attorney, she said that because of childhood trauma, "[her] mind didn't integrate [her] personality, which created alter[] [egos] to basically take over and have different roles in order to be able to function."  *Id.* at 52.  At the time of the hearing, she also testified that she drank alcohol only "[o]ccasionally" and last "drank excessively" at the beginning of 2020.  *Id.* at 53.  She also said she stopped using cocaine in March 2019.  *Id.*

At the initial hearing, a vocational expert ("VE") classified Plaintiff's past relevant work as a beauty consultant as a "sales attendant" job, which is "unskilled work with an exertional level of light."  *Id.* at 41, 61.  He classified Plaintiff's past relevant job at Staples as a cashier, which has the same exertional level.  *Id.* at 61.  At the supplemental hearing, the ALJ classified

Plaintiff's past relevant work as a "salesperson, cosmetics and toiletries," which requires "light exertion," and "instant print operator," which Plaintiff actually performed at a "light" exertional level.  *Id.* at 65, 84–85.

Dr. Efobi also testified during the supplemental hearing, explaining how he came to the conclusion that Plaintiff's substance use was material to her disability.  *See id.* at 75–76.  He pointed to differences in the treatment notes and Plaintiff's self-reported symptoms in the periods in which Plaintiff used substances and the periods in which she maintained sobriety.  *See id.* Specifically, he explained that Plaintiff was engaged in active substance use in 2018 until her psychiatric hospitalization in July of that year.  *See id.* at 77.  In his opinion, treatment notes and mental status examinations between her July 2018 hospitalization and January 2019 indicated that Plaintiff showed improved psychiatric symptoms and was doing "fairly well functionally." *See id.* at 76–77.  During that extended period of sobriety, Dr. Efobi observed that Plaintiff was reaching out to friends and expressed no desire to drink alcohol.  *See id.* at 76.  He also noted that Plaintiff had returned to working as an escort at this time.  *See id.* (referencing *id.* at 1027). But when her sobriety ended in February 2019, she reported increased symptoms of anxiety and depression.  *See id.* at 76 (referencing *id.* at 999).  Based on the available medical records, Dr. Efobi determined that any periods of decompensation[4] or increased psychiatric symptoms corresponded with Plaintiff engaging in substance use.  *See id.* at 76–77.

## IV.   The ALJ's Decision and Procedural History

SSA initially denied DIB on July 10, 2020.  *See id.* at 112–16.  SSA denied reconsideration on December 1, 2020.  *See id.* at 124–28.  On July 26, 2022, the ALJ issued an

---

[4]     "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler v. Astrue*, 546 F.3d 260, 266 n.5 (2d Cir. 2008).

unfavorable decision. *See id.* at 10–32. The ALJ's decision became the final decision of the Commissioner on April 20, 2023, when the SSA Appeals Council denied Plaintiff's request for review. *See id.* at 1–3. On June 22, 2023, Plaintiff initiated this appeal. *See* ECF No. 1. Plaintiff filed her motion on November 7, 2023, *see* ECF No. 9, and Defendant filed her motion on December 6, 2023, *see* ECF No. 11. Although the Court gave Plaintiff the opportunity to file a reply brief, *see* Sept. 14, 2023, Text Order, she did not do so.

## **LEGAL STANDARD**

Plaintiff alleges that the ALJ's decision contained legal errors and was unsupported by substantial evidence. *See* ECF No. 9-1 at 4. In such a circumstance, the Court must "conduct a plenary review of the administrative record" and determine "whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence." *Rucker v. Kijakazi*, 48 F.4th 86, 90–91 (2d Cir. 2022). As an initial matter, the Court must "determine whether the ALJ committed an error of law that might have affected the disposition of the case." *See Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. 2019) (quoting *Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004)). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler*, 546 F.3d at 265. The Court does not defer to the ALJ's legal conclusions. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010).

In contrast, "[t]he substantial evidence standard is a very deferential standard of review— even more so than the clearly erroneous standard." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022). But the standard is "not merely hortatory: It requires relevant evidence which would lead a reasonable mind to concur in the ALJ's factual determinations." *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022). The Court is therefore "required to examine the entire record, including

contradictory evidence and evidence from which conflicting inferences can be drawn." *Schillo*, 31 F.4th at 74.  Once an ALJ has made findings of fact, however, the Court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (emphasis in original).  Put another way, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *Id.*  Although an ALJ is not required to "reconcile[]" "every conflict in [the] record," the ALJ must describe "the crucial factors in any determination . . . with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).

## DISCUSSION

The issue animating this appeal is a prohibition, enacted by Congress in 1996 through the Contract with America Advancement Act, denying DIB if drug addiction or alcoholism ("DAA") "materially contributed to the disability."  *See Bradley v. Barnhart*, 87 F. App'x 190, 191 (2d Cir. 2003) (citing 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.")); *see also* 42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.93.  Because Plaintiff's arguments ultimately turn on the ALJ's application of this prohibition, the Court begins its analysis by describing the relevant legal frameworks, including as the ALJ applied them to this case, and then proceeds to Plaintiff's specific challenges.

## I.    Determining Disability

### A.    Definition

Under the Social Security Act, a "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A). A claimant will be found disabled only when her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A); *see also id.* § 1382c(a)(3)(B).

### B.    Five-Step Sequential Evaluation

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is performing substantial gainful activity, then the claimant is not disabled. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the twelve-month durational requirement. *Id.* § 404.1520(a)(4)(ii) (referencing *id.* § 404.1509); *id.* § 416.920(a)(4)(ii) (referencing *id.* § 416.909). If the claimant does not have a severe impairment or combination of impairments that meets the durational requirement, then the claimant is not disabled. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained

by the SSA that identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled. If not, the ALJ proceeds to step four.

At step four, the ALJ evaluates the claimant's past relevant work and residual functional capacity ("RFC"), defined as "the most [the claimant] can still do despite [her] limitations." *Id.* § 404.1545(a)(1); *see id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past five years,[5] the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. *Id.* §§ 404.1560(b)(1)(i), 416.960(b)(1)(i). If the claimant's RFC permits her to perform past relevant work, she is not disabled. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, in light of her RFC, age, education, and work experience, a claimant can perform other substantial gainful employment. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

"The claimant bears the burden of proof in the first four steps . . . ." *Schillo*, 31 F.4th at 70. "In step five, the burden shifts, to a limited extent, to the Commissioner," but the Commissioner "need not provide additional evidence of the claimant's [RFC]" at that stage. *Id.*

---

[5]    At the time of the ALJ's decision, Section 404.1560(b)(1) provided for a 15-year lookback. On June 22, 2024, the Commissioner promulgated a final rule amending it to shorten the period to five years. *See* Intermediate Improvement to the Disability Adjudication Process, Including How We Consider Past Work, 89 Fed. Reg. 27653 (Apr. 18, 2024); Intermediate Improvement to the Disability Adjudication Process, Including How We Consider Past Work; Deferral of Effective Date, 89 Fed. Reg. 48138 (June 5, 2024). As the Tenth Circuit recently observed, nothing in the amended rule suggests that it should be applied with retroactive effect, so even if this aspect of the analysis were directly relevant here, the Court would still apply the version of the rule that the ALJ used, *see Tina W. v. Comm'r, SSA*, No. 24-4029, 2024 WL 5165687, at *3 (10th Cir. Dec. 19, 2024), as is consistent with the Second Circuit's practice, *see Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 n.1 (2d Cir. 2015).

### C.    DAA Framework

In cases, like this one, where "there is medical evidence of an applicant's [DAA], the disability inquiry does not end with the five-step analysis," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012), which is initially performed "without segregating out any effects that might be due to substance use disorders," *Melissa P. v. Comm'r of Soc. Sec.*, No. 23-cv-01314, 2024 WL 4635045, at *2 (W.D.N.Y. Oct. 31, 2024).  Accordingly, if an ALJ determines that a claimant is disabled under the five-step analysis, the "critical question" for the ALJ is "whether the SSA would still find the claimant disabled if she stopped using drugs or alcohol." *See Cage*, 692 F.3d at 123 (citing 20 C.F.R. § 416.935(b)(1)); *see also* 20 C.F.R. § 404.1535(b)(1).  In other words, "the ALJ must determine which, if any, of the claimant's limitations would remain if the claimant were to stop the drug or alcohol use and if any of the remaining limitations would render the claimant disabled." *Kelly v. Comm'r of Soc. Sec.*, No. 19-cv-1363, 2020 WL 6945926, at *2 (E.D.N.Y. Nov. 25, 2020) (citing 20 C.F.R. §§ 416.935(b)(2)(i)–(ii), 404.1535(b)(2)(i)–(ii)).

In making this determination, the ALJ must "apply the steps of the sequential evaluation a second time to determine whether the claimant would be disabled if . . . she were not using drugs or alcohol." *See* Social Security Ruling (SSR) 13-2p, 2013 WL 603764 (Feb. 20, 2013); *Cordero v. Astrue*, 574 F. Supp. 2d 373, 377 (S.D.N.Y. 2008).  If the ALJ answers that question affirmatively, the claimant—notwithstanding her DAA—is considered disabled within the meaning of the Act.  20 C.F.R. §§ 416.935(b)(2)(ii), 404.1535(b)(2)(ii).  If not, her DAA is material, and the claimant is not eligible for DIB.  20 C.F.R. §§ 416.935(b)(2)(i), 404.1535(b)(2)(i).  The claimant bears the burden of proving that her substance use is not

material, *see Cage*, 692 F.3d at 123, and the ALJ's materiality determination must be supported by substantial evidence, *see id.* at 126–27.

### D.    Application to this Case

The ALJ found that Plaintiff met the insured status requirement of the Act through March 31, 2020, the date last insured ("DLI").[6]  *See* AR at 13.  The ALJ then proceeded to the required five-step analysis.  *See id.* at 13–15.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 20, 2018.  *See id.* at 13.  At step two, the ALJ found that, through the DLI, Plaintiff had the following severe impairments: depressive disorder, anxiety disorder, panic disorder with agoraphobia, borderline personality disorder, impulse control disorder, PTSD, and alcohol and cocaine use disorder.  *See id.* at 13–14.  The ALJ also found that Plaintiff suffered from two physical impairments—possible ischemic infarction connected to her suicide attempt[7] and hypertension—which the ALJ found to be non-severe.  *See id.* at 13–14.  Importantly, at step three, the ALJ determined that "[t]hrough the [DLI], including [Plaintiff]'s substance abuse, the severity of [Plaintiff]'s impairments equal the criteria of" the following sections of the SSA's list:  12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders).  *See id.* at 14–17; *see also* 20 C.F.R. Part 404, Subpart A, Appendix 1.[8]  In the typical case, that step-three conclusion would render the claimant "*per se*" disabled,

---

[6]    The DLI is "[t]he last date a person meets the requirements" of being both disabled and insured for benefits, and, therefore, qualified for DIB.  *See Vargas Maldonado v. Comm'r of Soc. Sec.*, No. 23-cv-03532, 2024 WL 1827300, at *1 n.2 (S.D.N.Y. Apr. 26, 2024).

[7]    At Paramus HFC, this was described as a "mini stroke."  *See* AR at 510.  "An ischemic stroke occurs when the blood supply to part of the brain is blocked or reduced."  *See Stroke*, Mayo Clinic (Dec. 13, 2024), https://perma.cc/7WT3-NCCB.

[8]    Each of these three listings contains different paragraphs with criteria, specified combinations of which must be satisfied for the ALJ to determine that the claimant's

see *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000), and the analysis would end there, *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  But this is not such a case because the DAA framework applies.  *See* AR at 17.

Accordingly, the ALJ re-ran the required analysis.[9]  At step two, the ALJ found that "if [Plaintiff] stopped the substance use, the remaining limitations would cause more than a minimal impact on [Plaintiff]'s ability to perform basic work activities; therefore, [Plaintiff] would have a severe impairment or combination of impairments."  *Id.*  Then, at step three, the ALJ concluded that "if [Plaintiff] stopped the substance abuse, [she] would not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments" classified as *per se* disabling, finding only mild or moderate limitations in the counterfactual scenario where Plaintiff stopped the substance use.  *See id.* at 17–19 (citing 20 C.F.R. § 404.1520(d)).  At step four, the ALJ concluded that if Plaintiff stopped the substance use, she would have the following RFC:

> [T]hrough the [DLI], if the claimant stopped the substance use, the claimant has had the [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations:  The claimant is limited to simple, routine and repetitive tasks and simple decision-making; occasional interaction with

---

impairments "meet" or are "equal to" the listed impairment.  20 C.F.R. §§ 404.1520(d), 416.920(d).  For example, listing 12.04 contains paragraphs A, B, and C, and the claimant must satisfy paragraphs A and B or A and C.  Some of those paragraphs internally contain more detailed requirements (and sub-requirements).  For instance, paragraph A of listing 12.04 can be satisfied by providing medical documentation of the requirements in subparagraphs 1 or 2.  Subparagraph 1, describing depressive disorder, is "characterized by five or more" symptoms, including "[d]epressed mood" and "[d]iminished interest in almost all activities."  *See* 20 C.F.R. Part 404, Subpart A, Appendix 1.  In this case, the ALJ analyzed the various components.  *See* AR at 14–19.

[9]    The ALJ did not explicitly repeat step one, but such repetition is unnecessary.  Controlling for Plaintiff's substance abuse in the repeated analysis would not change whether Plaintiff "[was] doing substantial gainful activity," which turns on the nature of the work done, *see* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i), since the ALJ concluded, and Plaintiff does not contest, that she was "not engaged in any work activity or made earnings through work activity . . . .  since her alleged onset date," *see* AR at 13.

coworkers, supervisors and the public; occasional changes in a routine work setting; can never climb ladders/scaffolds/ropes or be around unprotected heights.

*See id.* at 19–29.  Continuing on at step four, the ALJ credited the testimony of the VE and concluded that with her RFC, Plaintiff would be unable to perform past relevant work as a salesperson or copy and print worker.  *See id.* at 30–31.  Finally, at step five, the ALJ considered Plaintiff's age, education, work experience, and RFC, and found that if she stopped substance use, there were jobs in significant numbers in the national economy that Plaintiff could perform, specifically referencing work as a counter supply worker, agricultural produce packer, or marker.[10]  *See id.* at 31–32.  Accordingly, the ALJ concluded that "the substance use disorder is a contributing factor material to the determination of disability because [Plaintiff] would not be disabled if she stopped the substance use."  *See id.* at 32 (citing 20 C.F.R. §§ 404.1520(g), 404.1535).  She was therefore not disabled from the alleged onset date through the DLI.  *See id.*

## II.    The ALJ Made No Legal Error

Plaintiff contends that the ALJ's DAA materiality determination was the product of legal error in two ways.  First, Plaintiff contends the ALJ misapplied the DAA framework.  *See* ECF No. 9-1 at 21–22.  Second, Plaintiff asserts that the ALJ's purported "failure to cite or analyze the applicable regulations addressing substance abuse analysis further suggests that the ALJ erred."  *See id.* at 22.  Plaintiff is incorrect on both points.

Plaintiff's primary contention is that the ALJ's decision contains "repeated references to [her] ongoing substance abuse issues," which "suggest that [the ALJ] may have improperly 'conflate[d] the substance abuse analysis with the disability determination itself.'"  *Id.* at 21 (brackets retained) (quoting *Piccini v. Comm'r of Soc. Sec.*, No. 13-cv-3461, 2014 WL 4651911,

---

[10]    A marker, also known as a "marking clerk" or "merchandise marker," "[m]arks and attaches price tickets to articles of merchandise to record price and identifying information."  *See* Dictionary of Occupational Titles, § 209.587-034, *available at* 1991 WL 671802.

at *15 (S.D.N.Y. Sept. 17, 2014)).  In other words, according to Plaintiff, the ALJ "put[] the cart before the horse" by failing to determine, in the first five-step analysis, whether Plaintiff was disabled irrespective of DAA materiality.  *See id.* at 21–22.  In opposition, Defendant says that "Plaintiff's arguments reflect a fundamental misunderstanding of the DAA framework, the ALJ's decision, or both."  *See* ECF No. 11-1 at 23.  Defendant is correct, primarily because Plaintiff misreads the ALJ's careful analysis.

The ALJ's decision demonstrates that she complied with the DAA framework.  As discussed above, at step two in the first application of the five-step process, the ALJ found that Plaintiff had the severe impairments of depressive disorder, anxiety disorder, panic disorder with agoraphobia, borderline personality disorder, impulse control disorder, PTSD, and alcohol and cocaine use disorder.  *See* AR at 13–14.  Then, at step three, the ALJ found that these mental impairments, including Plaintiff's substance use disorder, medically equaled the criteria of listings 12.04, 12.06, and 12.08.  *See id.* at 14–17.  The ALJ provided the following detail:

> [T]he claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are generally consistent with the evidence *when the substance use is included*.  The evidence of record shows that during periods of substance abuse, the claimant's mental functioning decompensates and causes her marked limitations that are generally consistent with her alleged symptoms and limitations. However, as discussed below, in the absence of substance abuse, her psychiatric symptoms improve and her functional abilities significantly improve.

*See id.* at 17 (emphasis added).  As such, the ALJ's analysis, which explicitly included the effect of Plaintiff's substance abuse, meant that Plaintiff was *per se* disabled.  *See supra* at 15–16.  And the ALJ complied with the regulations by truncating her analysis there, since if the ALJ finds a claimant disabled at a step, she "do[es] not go on to the next step."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also, e.g.*, *Bradley F. v. Comm'r of Soc. Sec.*, No. 21-cv-0529, 2023 WL

6163432, at *5–6 (W.D.N.Y. Sept. 21, 2023) (ALJ properly proceeded immediately to DAA materiality analysis after finding claimant *per se* disabled at step three of the first application of the five-step test).  The ALJ proceeded to reapply the five-step sequence, at which point the decision goes into a searching examination of the record and provides extensive detail regarding Plaintiff's DAA and its materiality.  *See* AR at 17–30.

In view of the foregoing, it is hard to decipher the exact nature of Plaintiff's appeal on this issue because it blends distinct legal and evidentiary challenges.  The Court will stick to the legal issues for now.  Plaintiff seems to take issue with the fact that the ALJ discussed Plaintiff's substance abuse in the first run of the five-step analysis, and that such discussion "suggest[s] that [the ALJ] may have discounted limitations associated with [Plaintiff's] impairments."  *See* ECF No. 9-1 at 21–24.  As an initial matter, and as Plaintiff's own argument makes clear, the mere discussion of Plaintiff's DAA in the ALJ's first five-step analysis was not error.  *See id.* at 19 ("[T]he ALJ must first make a determination as to disability by following the five-step sequential evaluation process, without segregating out any effects that might be due to substance use disorders." (quoting *Morales v. Colvin*, No. 13-cv-06844, 2015 WL 13774790, at *17 (S.D.N.Y. Feb. 10, 2015), *report and recommendation adopted*, 2015 WL 2137776 (S.D.N.Y. May 4, 2015)).  Rather, at that stage, the ALJ properly considered the DAA as part of her analysis into the severity of Plaintiff's impairments.  *See Patrick F.G. v. Comm'r of Soc. Sec.*, No. 20-cv-0537, 2021 WL 3421446, at *8 (W.D.N.Y. Aug. 5, 2021) ("In general, if a plaintiff has . . . DAA . . . and if plaintiff is disabled considering all of his or her impairments, including the DAA, then the ALJ is required to perform addition[al] analysis.").

Furthermore, as Defendant correctly notes, *see* ECF No. 11-1 at 23, this is case is fundamentally different from cases like *Piccini* and others cited by Plaintiff because the ALJ

here *did* find Plaintiff disabled in the first five-step analysis, *see* AR at 17. In other words, this is not a case in which the ALJ improperly considered a plaintiff's substance abuse in the first five-step analysis to "discount[]" her limitations and reach the conclusion that the claimant was not disabled. *See Piccini*, 2014 WL 4651911, at *15 ("[I]t is unclear whether or not [plaintiff's] alcoholism was the reason for the determination that she was not disabled."); *see also, e.g.*, *Lovelace v. Colvin*, No. 15-cv-4704, 2016 WL 4708239, at *4, *7 (S.D.N.Y. Aug. 2, 206) (where the ALJ found no *per se* disability at step three, remanding because the ALJ did not "first determin[e] whether Plaintiff was disabled"), *report and recommendation adopted*, 2016 WL 4690412 (S.D.N.Y. Sept. 7, 2016). Here, in contrast, the ALJ found Plaintiff disabled in the first five-step analysis and then appropriately proceeded immediately to the DAA materiality analysis. *See Cordero*, 574 F. Supp. 2d at 377.

Plaintiff's argument can also be read to suggest that the ALJ was required to complete all five steps in the first round of analysis before proceeding to the DAA materiality evaluation and reapplying the five-step sequence. For instance, Plaintiff contends that "the ALJ's RFC analysis is replete with references to [Plaintiff's] struggles with alcohol," ECF No. 9-1 at 20 (citing AR at 19–30), and that as a result, "the ALJ effectively concluded that the record documents show that any psychiatric exacerbations [Plaintiff] has experienced have been related to substance use," *id.* at 21. That argument is also misplaced. As previously explained, and as noted in Defendant's motion, "the sequential analysis can be applied twice without necessarily reaching each step twice." *See* ECF No. 11-1 at 24 n.3. Here, because Plaintiff was presumed disabled at step three in the first round of the five-step analysis, the ALJ was not required to—and the regulations told

20

her not to—complete it.  *See supra* at 18–19.[11]  More fundamentally, Plaintiff confusingly

complains that the ALJ considered her medical records to examine the relationship between her

DAA and psychiatric conditions.  *See* ECF No. 9-1 at 20.  But that is the very purpose of the

DAA materiality evaluation.  *See* 20 C.F.R. §§ 404.1535, 416.935.

Second, Plaintiff argues that the ALJ erred by "fail[ing] to cite or analyze the applicable

regulations addressing substance abuse analysis further suggests that the ALJ erred."  *See* ECF

No. 9-1 at 22.  Notably, Plaintiff does not say what regulations the ALJ was supposedly required

to cite.  Nevertheless, the relevant regulation in this regard is 20 C.F.R. § 404.1535.  *Cf. Piccini*,

2014 WL 4651911, at *15 ("The ALJ never cited 20 C.F.R. § 404.1535 in his decision.").[12]  That

accusation is wrong because the ALJ cited the relevant regulation twice.  *See* AR at 13, 32.  The

argument also misses the point.  In the cases relied upon, the failure to cite the regulation

illuminated that the ALJ "did not follow the prescribed procedure."  *See Parker*, 2014 WL

---

[11]     Moreover, Plaintiff cites specific portions of the ALJ's decision to support her argument that the ALJ "improperly conflated the substance abuse analysis with the disability determination."  *See* ECF No. 9-1 at 20–21 (citing AR at 19–30).  These citations, however, are to sections of the decision in which the ALJ was engaged in the DAA materiality assessment *after* having made the initial determination that Plaintiff's severe mental impairments were disabling.  *Compare* AR at 13–17 (first application), *with id.* at 17–31 (second application).  Plaintiff's citations, therefore, highlight her misunderstanding.

[12]     Plaintiff's own authorities confirm this.  *See Patterson v. Colvin*, No. 15-cv-75, 2016 WL 7242157, at *8 (E.D. Mo. Dec. 15, 2016); *Parker v. Comm'r of Soc. Sec.*, No. 12-cv-14316, 2014 WL 902692, at *11 (E.D. Mich. Mar. 7, 2014).  Although not raised by Plaintiff, for the sake of completeness, the Court observes that the ALJ did not cite SSR 13-2p, which describes a six-step process for determining DAA materiality:  (1) Does the claimant have DAA?  (2) Is the claimant disabled considering all impairments, including DAA?  (3) Is DAA the only impairment?  (4) Is the other impairment(s) disabling by itself while the claimant is dependent upon or abusing drugs or alcohol?  (5) Does the DAA cause or affect the claimant's medically determinable impairment(s)?  (6) Would the other impairment(s) improve to the point of nondisability in the absence of DAA?  As a technical matter, the ALJ is not obligated to cite SSR 13-2p in a case like this one.  *See Johnson v. Berryhill*, No. 17-cv-6436, 2018 WL 4275985, at *13 (W.D.N.Y. Sept. 7, 2018).  And in any event, the ALJ's decision makes clear that she complied with the SSR.

902692, at *11.  But Plaintiff points to no procedural error in this case.  And the Court cannot detect one.

### III.    Substantial Evidence Supports the ALJ's Decision

Having concluded that the ALJ applied the correct legal framework, the Court turns to Plaintiff's more minor arguments challenging the sufficiency of the evidence.  Although Plaintiff continues to weave between alleged procedural and evidentiary defects, the Court can identify two evidentiary challenges.  First, she argues that the ALJ "improperly factored in [her] substance abuse when evaluating th[e] assessment[s]" of LMHC Mackie and NP Cochran.  *See* ECF No. 9-1 at 22.  Second, Plaintiff argues that the ALJ was incorrect when she found the medical opinion and testimony of Dr. Efobi more persuasive than the medical opinions of LMHC Mackie and NP Cochran.  *See id.* at 25.  As it relates to medical opinions in the record, the ALJ must "consider[] the persuasiveness of each medical opinion using the factors listed in [20 C.F.R.] § 404.1520c(c)(1)–(5)."  *Rubin v. O'Malley*, 116 F.4th 145, 148 (2d Cir. 2024).  Those factors are supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(c)(1)–(5).  "[S]upportability and consistency are the most important, and the Commissioner must therefore explain how [s]he considered supportability and consistency as applied to [the] medical source's opinion in his determination or decision."  *Rubin*, 116 F.4th at 148.  Supportability refers to the extent to which a medical source opinion is supported by objective medical evidence and the medical source's explanations.  20 C.F.R. § 404.1520c(c)(1).  And consistency refers to the extent to which a medical source's opinion is consistent with other medical or non-medical sources.  *Id.* § 404.1520c(c)(2).  For the reasons explained below, the Court finds neither of Plaintiff's arguments on this front convincing.

Plaintiff's first evidentiary challenge is that "the ALJ's discussion" of LMHC Mackie's and NP Cochran's medical opinions "suggest[s] that [s]he improperly factored in [Plaintiff]'s substance use when evaluating th[ose] assessment[s]." *See* ECF No. 9-1 at 22. On this point, Plaintiff neither explains how the ALJ "factored in" this evidence nor argues why it was "improper" for her to do so. To be sure, the ALJ found the opinions of LMHC Mackie and NP Cochran "unpersuasive." *See* AR at 26–27. The ALJ provided several reasons for this but stated that the "most notabl[e]" problem was that their "opinions largely fail[ed] to address the issue of [Plaintiff]'s substance abuse until [NP] Cochran's May 2022 opinions." *See id.* at 26.[13] The ALJ went on to explain that "[e]ven those May 2022 opinions fail to provide any probative analysis, rationale, or explanation for the conclusion that [Plaintiff's] substance abuse is immaterial to her mental limitations." *See id.* The ALJ's decision to discount these opinions is supported by more than substantial evidence in the record. In particular, the Court agrees that NP Cochran's May 2022 opinions, *see* AR at 1058–59, are threadbare and "not particularly informative." *See Colgan*, 22 F.4th at 361.

Furthermore, as a principled matter, it is again confusing for Plaintiff to argue that the ALJ—tasked with determining the materiality of Plaintiff's DAA—took issue with the fact that these opinions largely failed to address Plaintiff's DAA. *See* 20 C.F.R. § 404.1535. As the ALJ properly observed, *see* AR at 27, the medical providers' failure to discuss this "objective medical evidence," 20 C.F.R. § 404.1520c(c)(1), in the record plainly undermines their opinions' supportability. *See Reddy v. Comm'r of the Soc. Sec. Admin.*, No. 23-cv-07947, 2025 WL 21942, at *5 (E.D.N.Y. Jan. 3, 2025) ("[T]he ALJ is permitted to, in view of the record, discount

---

[13]    Plaintiff argues that this was a "false statement" because "[]NP Cochran did address material of alcohol use on May 16, 2022[,] and May 20, 2022, *see* ECF No. 9-1 at 21 n.4, but that argument misreads the record. As Plaintiff's own briefing makes clear, that ALJ was referring to LMHC Mackie's total failure to address DAA, not NP Cochran's. *See* AR at 26.

a physician's opinion.").  Plaintiff also advances the argument that "while substance abuse is ultimately relevant in determining whether a claimant is disabled under the regulations[,] it bears no relevance to the weight that must be given to the opinion of a treating physician."  *See* ECF No. 9-1 at 22 (quoting *Morales*, 2015 WL 13774790, at *22).[14]  But Plaintiff has again gotten the relevant order of operations wrong.  As her own authority makes clear, that statement of law concerns "[d]ismissal of a physician's opinion during the initial determination of disability."  *See Piccini*, 2014 WL 4651911, at *16 (quoting the precedent underlying *Morales*).  As above, the ALJ's discounting of these opinions took place only after she initially found Plaintiff disabled. *See* AR at 26–27.  And the ALJ's decision to do that discounting, as articulated in significant detail in her opinion, was supported by substantial evidence.

Plaintiff's second argument attacking the ALJ's consideration of the competing medical opinions is also unpersuasive.  Plaintiff asserts that Dr. Efobi cherrypicked medical evidence to support his finding of DAA materiality and argues the ALJ should have instead relied on NP Cochran's conclusion that Plaintiff's DAA was immaterial.  *See* ECF No. 9-1 at 25. According to Plaintiff, Dr. Efobi, and thus the ALJ, "ignore[ed] the evidence that supported finding substance use immaterial."  *See id.*  But aside from "[LMHC] Mackie's report of [Plaintiff]'s symptoms during a period of sobriety," Plaintiff does not identify other evidence consistent with DAA immateriality.  *See id.*  The same is true of her conclusory argument that "[]NP Cochran's opinion regarding materiality . . . is supported by the record."  *See id.*

_____

[14]    To the extent that Plaintiff is attempting to rely on the "treating physician rule" here, which "generally require[d] deference to the medical opinion of a claimant's treating physician," *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), SSA has since done away with that rule, which does not apply to claims, like this one, filed after March 27, 2017, *see Bechard v. Colvin*, No. 23-7774, 2024 WL 5274654, at *2 n.2 (2d Cir. Jan. 2, 2025).  Now, ALJs do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[,] . . . including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).

As an overarching matter, Plaintiff's argument really just asks the Court to reweigh the evidence considered by the ALJ.   However, that exceeds the scope of this Court's "limited review."  *Schillo*, 31 F.4th at 69.   "[U]nder the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position."  *See Warren v. Comm'r of Soc. Sec.*, No. 15-cv-1185, 2016 WL 7223338, at *6 (N.D.N.Y. Nov. 18, 2016), *report and recommendation adopted*, 2016 WL 7238947 (N.D.N.Y. Dec. 13, 2016).  Rather, it must be the case that "no reasonable factfinder could have reached the same conclusion" as the ALJ.  *Schillo*, 31 F.4th at 78.  This is no such case.

Here, the ALJ clearly and adequately set forth her reasons for accepting the findings of Dr. Efobi while declining to adopt the opinions of NP Cochran and LMHC Mackie.  *See* AR at 24–29.  In particular, the ALJ was unpersuaded by the medical opinions submitted by LMHC Mackie and NP Cochran because they were "unsupported, medically inconsistent with the evidence of record, and in many instances entirely conclusory."  *Id.* at 26.  Plaintiff emphasizes NP Cochran's May 2022 medical opinions in which she opined that Plaintiff "remains totally disabled without consideration of any past or present drug and alcohol use.  [NP Cochran] explained that drug and alcohol use are not material to her disability."  *See* ECF No. 9-1 at 21 n.3.  At the threshold, the ALJ did not err by giving no weight to NP Cochran's opinion that Plaintiff was disabled.  *See* AR at 26.  That is because "[t]he ultimate finding of whether the claimant is disabled is reserved to the agency."  *Schillo*, 31 F.4th at 70; *see also* 20 C.F.R. § 404.1520b(c)(3)(i) (statement that the claimant is disabled is a "statement[] on [an] issue[] reserved to the Commissioner" and therefore "inherently neither valuable nor persuasive to the issue of" disability).

Continuing on, the ALJ's weighing was supported by substantial evidence.  First, Plaintiff did not begin treatment with NP Cochran until April 2020, after the DLI.  *See* AR at 23, 26–27.  Because Plaintiff must have been disabled as of the DLI, "reliance on evidence demonstrating a worsening of her condition after that date is of little value."  *Vilardi v. Astrue*, 447 F. App'x 271, 272 (2d Cir. 2012).  However, the ALJ need not wholly disregard such evidence where "evidence of an applicant's condition subsequent to [her] [DLI] may be pertinent to [her] condition prior to that date."  *O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014).  And here, the ALJ properly considered the post-DLI evidence, which "continued to show that in the context of sobriety and without substance abuse, [Plaintiff]'s mental impairments cause no more than moderate mental limitations that are consistent with her [RFC]."  *See* AR at 23.  In this vein, the marked limitations put forth by NP Cochran were based on her assessment of Plaintiff's past episodes that occurred prior to when she began treating Plaintiff and without accounting for Plaintiff's substance use at that earlier time.  In fact, her February 2022 opinion explains that the marked limitations had been present since Plaintiff's "childhood" due to a "history of repeated physical and sexual abuse."  *See* AR at 1057.  Alternatively, the opinions improperly focused on the present state of affairs well after the DLI.  *See id.* at 1058 (explaining in May 2022 that Plaintiff "is not using any drugs or tobacco and only drinks occasionally and socially, so substances do not, in any way, impair her ability to work").

Second, the ALJ found, and the Court agrees, that NP Cochran's May 2022 statements provided no details or explanation to support the conclusion that Plaintiff's limitations were entirely work-preclusive, *see id.* at 26–27; *see also supra* at 23, even if NP Cochran reported in February 2021 that Plaintiff's anxiety "makes it difficult for her to hold jobs and to function in society," *see* AR at 635.  Third, the ALJ discussed how the marked limitations reflected in

NP Cochran's opinions were not supported by her own treatment notes from that same time period. *See id.* at 27. The administrative record indicates that while in the care of NP Cochran, Plaintiff showed stability during her mental exams. Although Plaintiff reported intermittent bouts of depression, she largely stated that she was doing well and maintained compliance with her medications in a manner which she was unable to previously maintain while engaged in substance use. *See, e.g.*, *id.* at 1061 (in March 2022, reporting "more consisten[cy] with medications" and therapy "going well" despite recent worsened anxiety); *id.* at 597 (in September 2020, reporting feeling "more motivated tha[n] she has been in a long time," and identifying no issues with eating, a good relationship with her girlfriend, and, according to a conversation with LMHC Mackie, no recent outbursts of anger or self-harm). These reports, from periods in which Plaintiff's DAA was controlled, are consistent with the treatment notes from the relevant period predating the DLI. Those notes show that at the beginning of Plaintiff's extended period of sobriety following her suicide attempt (July 2018 through January 2019), she "acknowledged that alcohol use was a problem" and that "abstaining from alc[ohol] helps w[ith] avoidance of suicidal [b]ehavior". *See id.* at 529, 536. The notes further demonstrate that during this period of sobriety, Plaintiff generally recognized the risks of alcohol use, did not show signs of agoraphobia, socialized with others, and maintained compliance with her medication program. *See id.* at 529–41, 543–87, 1011–55. On this point, the Court agrees with the ALJ that this abundant evidence renders NP Cochran's opinions "overstated." *See* AR at 26–27.[15]

---

[15]    The parties concentrate on NP Cochran's analysis, but the ALJ's decision to discount LMHC Mackie's opinions was also supported by substantial evidence for similar reasons, including, as Defendant puts it, that she "had never seen Plaintiff until the cusp of the [DLI]." *See* ECF No. 11-1 at 27; *see also* AR at 23. Most critically, as found by the ALJ, LMHC Mackie did not address Plaintiff's DAA at all. *See* AR at 26. In her briefing, Plaintiff does not characterize LMHC Mackie's opinions differently, noting that she described Plaintiff's symptoms "during a period of sobriety." *See* ECF No. 9-1 at 25; AR at 622–23.

On the other hand, the ALJ found persuasive the medical opinion of Dr. Efobi, who responded to medical interrogatories and testified at Plaintiff's administrative hearing, during which his medical opinion remained consistent with the original conclusion that Plaintiff's DAA was material.  In explaining her reasoning, the ALJ noted that Dr. Efobi's opinion was based on a review of all material evidence prior to the DLI.  *See* AR at 27–29.  Having reviewed the record, the Court agrees that there is substantial evidence supporting the ALJ's decision to credit Dr. Efobi's "probative, detailed, well supported, and medically consistent opinion."  *See id.* at 35.  Dr. Efobi cited specific periods of sobriety (with exact cites to the AR), during which Plaintiff's symptoms improved significantly, in support of his conclusion that "[a]lcohol [and] [c]ocaine use were strong factors in [the] severity of [Plaintiff]'s limitations" and that her limitations would be "mild to moderate" with "sustained sobriety."  *See id.* at 955.  In particular, as discussed above, Dr. Efobi addressed the treatment notes from the period of sobriety following Plaintiff's suicide attempt, which showed "significant improvement" in her mental status.  *See id.*; *see also id.* at 77 (hearing testimony).  He similarly identified February 19, 2019, and February 26, 2019, reports, supported by contemporaneous medical reports, linking Plaintiff's DAA with worsened psychological symptoms.  *See id.* at 76 (citing *id.* at 995, 999).

Plaintiff critiques Dr. Efobi for supposedly "ignoring the evidence that supported finding substance use immaterial," but refers only to "[LMHC] Mackie's report of [Plaintiff]'s symptoms during a period of sobriety."  *See* ECF No. 9-1 at 25.  But as already discussed, that analysis (in contrast to Dr. Efobi's) did not address Plaintiff's DAA, much less during the relevant time period.  And, if anything, LMHC Mackie's views *support* Dr. Efobi's conclusion that Plaintiff's mental state improved during "windows of sobriety" but decompensated following alcohol use.  *See* AR at 76.  In this sense, this case contains even more evidence than

the Court of Appeals has required for the Court to affirm the ALJ's materiality determination. *See Cage*, 692 F.3d at 126–27 (affirming where the administrative record contained "positive evaluations of [the claimant] conducted" when the claimant was sober even though the record "d[id] not reveal any extended periods of sobriety during the relevant period").  To be sure, Plaintiff's psychological symptoms "persisted" during periods of sobriety, but, consistent with Dr. Efobi's opinion, they clearly became "milder."  *See Kass v. Kijakazi*, No. 22-cv-01062, 2023 WL 5310445, at *5 (E.D.N.Y. Aug. 17, 2023) (affirming ALJ's immateriality determination); *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 (2d Cir. 2018) (plaintiff failed to carry her burden where the record showed improved psychological symptoms during substance abuse treatment and where the claimant "herself reported to her doctors that her substance abuse made her psychiatric conditions worse and that she experienced improvements when sober").   In view of Dr. Efobi's opinion and the other evidence in the record, the ALJ's conclusion that Plaintiff would not be disabled without the DAA was supported by substantial evidence.

*          *          *

## CONCLUSION

Having thoroughly reviewed the record in this case, the Court must recognize that

Plaintiff has experienced extreme adversity since early in her life.  It sympathizes with her plight.

But there are sharp lines in this area, both substantively with respect to the law on DAA as well

as in regard to the scope of this Court's review.  For the reasons explained above, it is clear that

the ALJ's decision is free of legal error and amply supported by substantial evidence.  Therefore,

the Court denies Plaintiff's motion for judgment on the pleadings, grants Defendant's cross-

motion, and affirms the ALJ's decision.  The Clerk of Court is respectfully directed to enter

judgment consistent with this Order and to close this case.

SO ORDERED.

 _/s/ Hector Gonzalez_____
HECTOR GONZALEZ
United States District Judge

Dated:  Brooklyn, New York
      February 4, 2025